Brassard, J.
On November 4 and 5, 1999, this matter was before the court on the motion of defen *17 dants A.H. Robins Co. (“Robins”) and Wyeth-Ayerst Laboratories (“Wyeth”), divisions of American Home Products, Inc. (“AHP”); and Fisons Corporation (“Fisons”) to exclude expert opinion testimony of the plaintiffs’ pathology expert, Dr. Eugene Mark (“Dr. Mark”). Both parties submitted extensive filings to the court and presented comprehensive oral arguments. Defendants seek to exclude Dr. Mark’s expert testimony concerning autopsy materials that were lost or destroyed before those materials could be examined by defense experts, and any opinions based on those materials as to the cause of death of Mary Linnen (“Ms. Linnen”), the deceased daughter of plaintiffs Thomas and Mary J. Linnen (“the Linnens”).
The materials at issue include certain body organs (lungs, heart, brain and kidney); stock tissues;[3] paraffin blocks;[4] and blood and other body fluids. In opposition to the motion, plaintiffs argue that a spoliation remedy is inappropriate because Dr. Mark himself neither lost nor destroyed any of the autopsy materials and, in addition, that any prejudice from the absence of the missing materials is de minimis because defendants have had access to adequate medical and pathological information to evaluate the cause of Ms. Linnen’s death.
For the following reasons, the motion is ALLOWED in part and DENIED in part.
BACKGROUND
Thirty-year-old Ms. Linnen was admitted to Quincy City Hospital in cardiac arrest at 7:18 p.m. on February 22, 1997, and was pronounced dead at 7:30 p.m. The Office of the Chief Medical Examiner (“OCME”) assumed responsibility for the autopsy, which was performed at the Massachusetts General Hospital (“MGH”) on the afternoon of February 25, 1997, by a resident, Dr. Howard Chang (“Chang”). The autopsy was supervised by Dr. Mark, the Chief of Pathology at the MGH, in his capacity as the District Medical Examiner for the OCME. Ms. Linnen’s death certificate was signed by OCME on March 21, 1997.
On the day of the autopsy, February 25, 1997, plaintiffs’ counsel sent Dr. Mark an unsolicited letter stating that Ms. Linnen had been taking “Phen Fen” appetite suppressant drugs in the month preceding the onset of her symptoms, and reminding Dr. Mark that “a causal nexus” had been found between those drugs and primary pulmonary hypertension (“PPH”) in the medical literature. The letter requested that Dr. Mark preserve certain pathology materials from the autopsy for examination by the plaintiffs’ independent medical experts. The requested autopsy materials included generous tissue samples from all involved organs and body parts, including the heart, lungs and liver. In addition, Dr. Mark was asked to rule out all possible secondary causes for Ms. Linnen’s death.[5]
After the autopsy, Dr. Mark ordered that certain pathology materials be preserved. The materials included Ms. Linnen’s lungs and heart, stock tissue, 38 paraffin blocks of representative sections of each organ, numerous slides prepared from the paraffin blocks, and photographs of certain organs and slides, as well as photographs of Ms. Linnen’s body.
At a subsequent pathology conference, a tray of autopsy tissues was presented to MGH pathologists, interns and residents for observation and discussion. After the conference, many of the autopsy materials became unavailable, and their whereabouts remains unknown.
In 1997, the defendants began to pursue the MGH and OCME for pathology materials from the autopsy. On November 28, 1997, in response to an inquiry from OCME about what Linnen tissue specimens were present at MGH, Dr. Mark reported in a memo to OCME that MGH had 37 paraffin blocks, 30 microscopic slides, a set of kodachromes created by photographing the slides through the microscope, and four sets of slides made from additional cuts from the paraffin blocks (“recut slides”).[6] Dr. Mark testified at his deposition that he delivered these autopsy materials to OCME shortly after he wrote the memo. The memo did not indicate that any organs or stock tissue from the Linnen autopsy were present at the MGH on November 28, 1997.
Dr. Mark maintains that it is standard procedure for the MGH to discard organs and stock tissues shortly after the autopsy and pathology conference. However, the chief autopsy technician at MGH, James Taralli (“Taralli”), testified at his deposition that it is the normal procedure at MGH to preserve stock tissues from an autopsy in jars of formaldehyde for two to three years. Taralli further testified that when the storage area becomes full, the stock tissue is discarded in six-month or one-year segments, beginning with the oldest specimens, and that no organs or stock tissue may be discarded without the approval of Dr. Mark. In June 1999, although the jars of Ms. Linnen’s stock tissue were no longer available, the stock tissue from other 1996 and 1997 autopsies had not yet been discarded.
By March 24, 1997, one month after the autopsy, Dr. Mark had prepared a draft of an article based on Ms. Linnen’s autopsy for the New England Journal of Medicine (“NEJM’j. The article, titled “Fatal Pulmonary Hypertension Associated with Short-Term Use of Fenfluramine and Phentermine,” was published on August 28, 1997 (337 NEJM 602-6).
On May 5, 1997, the plaintiffs filed suit. On May 13, 1997, defendants’ counsel wrote to plaintiffs’ counsel, requesting that plaintiffs take all necessary steps to ensure that the autopsy materials were preserved. Plaintiffs’ counsel transmitted the request to the OCME, but not to Dr. Mark or to MGH.
On May 21, 1998, plaintiffs’ attorney retained Dr. Mark as an expert witness. In July 1998, defendants *18 sought to depose Dr. Mark. On July 29, 1998, Dr. Mark hand-delivered what he believed to be all remaining Linnen pathology materials to OCME’s in-house counsel. To the extent that those materials included organs, stock tissues or 37 of the 38 paraffin blocks from Ms. Linnen’s autopsy, those materials have since become unavailable.[7] On January 26, 1999, Dr. Mark stated in a letter to OCME that he had delivered all of the existing pathology materials to OCME.
Between 1997 and 1999, defendants repeatedly sought Ms. Linnen’s organs, blood and tissue specimens from MGH and the OCME for independent testing. Defendants were not informed until February, 1999 that a significant portion of the autopsy materials, including the lungs, heart, tissues, and fluid samples, were no longer available. On February 11, 1999, plaintiffs’ counsel informed defendants’ counsel that limited autopsy materials remained, that the lungs and heart had been discarded by MGH per “usual custom and procedure, ” and that the remaining materials had been delivered to the OCME.
On March 8, 1999, defendants received four sets of 37 or 38 microscopic slides. On June 25, 1999, defendants were notified that Dr. Mark had located one of the missing 38 paraffin blocks, Block A, which contained samples of right kidney tissue. Block A was made available to defendants for examination, slide preparation, and testing. On August 4, 1999, Dr. Mark located, in a research file drawer in his office, a set of 70 additional recut slides he had used to prepare his NEJM article and for other research/medical uses. These slides were made available to defendants.
In total, defendants received five sets of recut microscopic slides, one paraffin block containing right kidney tissue, and some specially stained slides from the Linnen autopsy. The lungs, heart, stock tissues, 37 paraffin blocks and blood fluids have been unavailable since some unspecified time after the autopsy and pathology conference. Defendants seek a spoliation remedy, and argue that the autopsy materials relied on by Dr. Mark in reaching his conclusions as to the cause of Ms. Linnen’s death were negligently or intentionally lost. The defendants contend that they have been unfairly prejudiced in this case by their experts’ inability to examine the missing pathology materials.
DISCUSSION
In order to obtain relief for spoliation of evidence by an opposing expert or parly, the moving party must demonstrate 1) that there was a negligent or intentional loss or destruction of physical evidence, 2) that the expert was aware that there was a potential for litigation, and that the physical evidence was material to that litigation, and 3) that the loss or destruction of the evidence created prejudice to the moving party. See Nally v. Volkswagen of America, 405 Mass. 191, 197 (1989); see also Bolton v. Massachusetts Bay Transportation Authority, 32 Mass.App.Ct. 654, 656 (1992). Plaintiffs argue that spoliation does not apply in this case because the autopsy materials were lost by MGH employees and/or OCME, and Dr. Mark is therefore without fault for the negligent or intentional destruction of evidence. In addition, plaintiffs contend that Dr. Mark performed the autopsy as a neutral government official in his capacity as District Medical Examiner, and was not acting as an expert for the plaintiffs at the time the materials were lost. Finally, the plaintiffs argue that the defendants have not been prejudiced by their inability to examine the missing autopsy materials to rule out possible alternative causes of Ms. Linnen’s death.
The court must determine whether there was negligence in connection with the loss of Ms. Linnen’s autopsy materials, whether responsibility for the loss of those items is attributable to the plaintiffs or their expert, whether the unavailability of the autopsy materials unfairly prejudices the defendants’ case, and what remedies would be appropriate in the event that spoliation occurred.
Material to Litigation
The court may preclude an expert from testifying to his observations of certain items and to opinions based on those observations when the expert has examined an item of physical evidence, no longer available, “in such circumstances that the expert knows or reasonably should know that the material in its original form may be material to litigation.” See Nally v. Volkswagen of America, Inc., 405 Mass. 191, 197 (1989).
This court concludes that Dr. Mark was aware of the potential for litigation concerning Ms. Linnen’s death and that Dr. Mark knew or should have known that the autopsy materials in their original form were likely to be important to the parties in such a lawsuit. Dr. Mark acknowledged in his deposition that he knew he was likely to be called as an expert witness when he was asked to supervise the Linnen autopsy for OCME. Shortly after the autopsy, Dr. Mark began preparing an article for the NEJM regarding his conclusions as to the cause of Ms. Linnen’s death. Dr. Mark received a letter from plaintiffs’ counsel on the morning of the autopsy requesting that he rule out all secondary causes of death and that he preserve specific autopsy materials for examination by independent medical experts. The letter also informed Dr. Mark that plaintiffs believed that ingestion of diet pills had caused Ms. Linnen’s death. For these reasons, it is reasonable to conclude that Dr. Mark was aware of the importance of the materials at issue in this case as well as the potential for litigation concerning Ms. Linnen’s death. See Nally v. Volkswagen, supra, at 197.
Negligence
Plaintiffs argue that, even if Dr. Mark was aware of the potential for litigation, he bears no responsibility for the unavailability of the autopsy materials, because the materials were lost by other MGH employees or by OCME. This court is aware that Dr. Mark is *19 responsible for the operation of a major department at a large Boston teaching hospital, and that he cannot be held responsible for the day-to-day activities of every individual in that department.
For several reasons, however, the court concludes that Dr. Mark, as the Chief of Pathology at MGH, bears some responsibility for the current unavailability of the autopsy materials. It is undisputed that Dr. Mark supervised the autopsy, and ordered certain materials from the autopsy preserved. In his deposition, Dr. Mark acknowledged that the loss of autopsy materials was a “relatively common occurrence” at MGH.[8] After careful review of all the materials submitted by the parties and others, the court is unable to determine whether Dr. Mark, employees of his Department, or OCME bears primary responsibility for the unavailability of the autopsy materials. The fact remains, however, that many of the pathology materials that were examined by Dr. Mark are now unavailable for examination by defense experts. Dr. Mark apparently had means at his disposal to safeguard the autopsy materials. When Dr. Mark wrote a scholarly article for the NEJM based on the autopsy findings, he undertook measures to secure those autopsy materials that were relevant to his research for the article.
Finally, it is not disputed that Dr. Mark had final authority in the hospital for the disposal of organs and stock tissues. Chief autopsy technician Taralli testified that no organs or stock tissue at MGH could be destroyed without Dr. Mark’s permission. For all of these reasons, the court concludes that, under all the circumstances, there was some negligence in the failure to preserve the Linnen autopsy materials, and that Dr. Mark bears some of the responsibility.
Neutral Government Official
Plaintiffs argue that Dr. Mark should be able to testify as to his expert opinions based on the autopsy because he supervised the autopsy in his capacity as District Medical Examiner. Plaintiffs contend that Dr. Mark participated in the autopsy as both a percipient witness and a neutral government official long before he was retained as an expert witness by the plaintiffs. As a general rule, the sanctions for intentional or negligent destruction of physical evidence do not depend on whether the expert’s conduct occurred before or after he was retained by a party to the litigation. See Nally v. Volkswagen, supra, at 198. The Court explained that the reason for the rule was that
unfair prejudice may result from allowing an expert deliberately or negligently to put himself in the position of being the only expert with first-hand knowledge of the physical evidence on which expert opinions as to defects and causation may be grounded.

Id.

In a subsequent decision, however, the Court noted that “circumstances might make inappropriate the application” of the “hard and fast rule” set forth in Nally. See Kippenhan v. Chaulk Services, Inc., 428 Mass. 124, 128, fn.3 (1998). In Kippenhan, the Court questioned the appropriateness of invoking spoliation remedies when “neither that party nor anyone acting on that party’s behalf was the spoliator.” Id. at 128. In this case, there is no evidence that Dr. Mark was acting on behalf of the plaintiffs or was in any way representing the plaintiffs’ interests at the time the autopsy materials became unavailable. Nor is there a suggestion that plaintiffs had any involvement in the disappearance of the autopsy materials. As the District Medical Examiner, Dr. Mark supervised the autopsy and signed the autopsy report in his independent role as a government official long before he was retained as an expert by the plaintiffs.
Prejudice
Defendants argue that they are entitled to a spoliation remedy because their experts’ inability to examine certain organs, tissues and body fluids from the autopsy prevented them from definitively confirming or ruling out the possible causes of Ms. Linnen’s pulmonary hypertension. Defendants contend that the absence of such definitive proof has prejudiced their defense. As an example of such prejudice, defendants point to plaintiffs’ assertion that defendants’ experts carmot “state to a reasonable degree of certainty the etiology of Ms. Linnen’s pulmonary hypertension.”
The dispute in this case centers on the cause of the pulmonary hypertension that resulted in Ms. Linnen’s death. The plaintiffs contend that ingestion of anorectic drugs caused Ms. Linnen’s pulmonary hypertension, and argue that Ms. Linnen’s medical records rule out all possible alternative causes. Defendants respond that Ms. Linnen’s medical records do not definitively rule out alternative causes of her pulmonary hypertension. Defendants contend that, had they been able to examine the missing autopsy materials, they might have been able to determine whether Ms. Linnen’s pulmonary hypertension resulted from one of the known alternative causes of the disease.
Defendants maintain, for example, that kidney tissue samples would have enabled them to test for the presence of systemic lupus erythematosus (“SLE”), a known cause of pulmonary hypertension. Similarly, defendants claim that the failure to preserve blood samples prevents them from testing for the presence of Human Immune-Deficiency Virus (“HIV”), another known cause of pulmonary hypertension.
Defendants contend that an examination of Ms. Linnen’s heart would have enabled their experts to determine conclusively whether her pulmonary hypertension was caused by a congenital heart defect. In addition, defendants argue that Dr. Mark failed to test the liver with special stains that would have revealed cirrhosis of the liver, another known cause of pulmonary hypertension. Further, defendants argue that Dr. *20 Mark’s failure to freeze or preserve tissue for more sophisticated microscopic tests, such as immunoflu-orescence or electron microscopy, prevented them from ruling out such possible causes of pulmonary hypertension as connective tissue disease or immune complex disease. Defendants contend that such tests were essential to their analysis because Ms. Linnen’s medical records suggest possible symptoms of SLE or mixed connective tissue disease.
Because the autopsy report fails to document the exclusion of these and other possible alternative causes of pulmonary hypertension, defendants contend that their experts’ inability to test the organs, tissues and blood samples to rule out such alternative causes has seriously prejudiced their defense.
In response, plaintiffs argue that defendants have access to sufficient materials to rule out other possible causes of Ms. Linnen’s pulmonary hypertension. At argument, plaintiffs represented that Dr. Mark’s testimony as to causation would be largely (“90-95%”) based on his review of the clinical history and his review of the slides and other materials that have been made available to defense experts.
Although plaintiffs contest defendants’ assertion that the missing pathology materials have prejudiced their defense, defendants have presented evidence that the inability to examine some of the missing autopsy specimens prevented their experts from definitively ruling out or confirming alternative causes for Ms. Linnen’s pulmonary hypertension. Although the court finds no evidence that the loss of the autopsy materials was intentional, there is some evidence of negligence in the loss of the materials, and the defendants have established that the missing materials cause some prejudice to their defense.[9]
Remedy
Where the moving party has established that missing physical evidence is material, although not necessarily crucial, to its defense, the court may apply a balancing test to determine the appropriate remedy. The court weighs the culpability of the party or expert to whom the negligence is attributed, the materiality of the evidence, and the potential for prejudice. See Carbone v. Checker Taxi Company et al, Superior Court Civil Case # 90-7707E, 3 Mass. L. Rptr. 240 (Suffolk, December 30, 1994) (Garsh, J.).
The court has broad discretion in fashioning a spoliation remedy. See Nally v. Volkswagen, supra, at 197 (power to exclude expert testimony and to exclude testimony that would unfairly prejudice an opposing party is within court’s discretion to make evidentiary rulings conducive to the conduct of a fair and orderly trial). At bottom, the evidentiary matters in dispute are the missing body organs, stock tissues, 37 paraffin blocks, and fluids from the autopsy; Dr. Mark’s observations of those items at the autopsy and following the autopsy; and Dr. Mark’s conclusions based on his observations as expressed in the autopsy report and the NEJM article. After careful evaluation of the circumstances of this case, including the negligence of Dr. Mark, Dr. Mark’s role as a neutral government official, the materiality of the evidence, and the extent of prejudice to the defendants, the court makes the following rulings concerning the evidence and the testimony the defendants seek to exclude:
Slides, paraffin block A, medical records
Dr. Mark may testify without restriction as to his expert opinions that are based on his observations of materials that have also been available to defendants’ experts.
The Autopsy and Autopsy Report
Dr. Mark may testify to observations he made during the autopsy and to his opinions based on those observations. Dr. Mark may not testify as to his examination of autopsy materials (including stock tissue and body fluids) after the conclusion of the autopsy. Dr. Mark may not testify, for example, to his observations of autopsy materials in connection with the pathology conference at MGH, in connection with lectures and presentations he made to medical students at any medical school, or in connection with his NEJM article.
Defendants may, of course, conduct a full cross examination of Dr. Mark as to his testimony regarding the autopsy and the autopsy report, including the subsequent loss of the autopsy materials.
NEJM Article
Dr. Mark’s article in the NEJM is based in part on his observations at the autopsy. In preparing the article, however, Dr. Mark was no longer acting as a neutral government official. Under all the circumstances of this case, and because a jury may afford significant weight to the publication of Dr. Mark’s conclusions as to causation in a prestigious journal such as the NEJM, Dr. Mark may not testify about the NEJM article.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendants’ motion is ALLOWED as to Dr. Mark’s NEJM article and as to any of Dr. Mark’s opinions about the cause of Ms. Linnen’s death based on post-autopsy observations of the pathology materials that have been unavailable to the defense.
The motion is DENIED as to Dr. Mark’s observations during the autopsy and as to his opinions based on those observations.
The court will consider a requested spoliation instruction at trial.

Representative tissues from organs that were preserved in formaldehyde during the autopsy, then stored in jars.

Stock tissue embedded in paraffin to make slides for microscopic examination.

Primary pulmonary hypertension is the term used to describe pulmonary hypertension of unknown cause, which occurs in the population at a background rate of approximately one or two per million. Where the cause of the pulmonary hypertension is known, the pulmonary hypertension is described as secondary to the known cause. In this case, plaintiffs seek to establish a causal relationship between Ms. Linnen's pulmonary hypertension and her ingestion of diet pills.

The parties vigorously dispute whether there are 250 slides (plaintiffs) or whether there are five duplicative sets of the same slides (defendants).

The parties dispute what happened to those materials. In an affidavit submitted to this court, Pamela Ring, former in-house counsel for the OCME, stated that she did not receive pathology materials from Dr. Mark, and denied that she ever had possession of any organs or stock tissue from the autopsy.

With regard to stock tissue, Dr. Mark testified that “I would suspect that of the 800 autopsies done in those two years [1996 and 1997], we would not find the tissue in many, many. Dozens.”

Plaintiffs, with some but not dispositive force, point out that the unavailability of the autopsy materials prejudices the plaintiffs more than the defendants because the missing materials would have supported Dr. Mark’s opinions as to causation.